# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | No. 16-cr-766 |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| ) | |
| MARIO URQUIZA-REYES ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Mario Urquiza-Reyes's motion to suppress [30] and related motion for reconsideration. For the reasons set forth below, the Court denies Defendant's motion for reconsideration of Judge Der-Yeghiayan's ruling declining to set this matter for a suppression hearing and denies Defendant's motion to suppress [30].[1]

## I. Background

### A. Request for Evidentiary Hearing

The Seventh Circuit has described "the resolution of a motion to suppress" as a "fact-intensive inquiry" in which the district court must make "credibility determinations" based on "its opportunity at the suppression hearing to hear the testimony and observe the demeanor of the witnesses." *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005); see also *United States v. Springs*, 17 F.3d 192, 194 (7th Cir. 1994) (explaining the deference given to the credibility determinations of the district judge who has "heard the conflicting testimony, observed the witnesses, and then reached a determination about whom to believe"). However, before a suppression hearing is warranted, a defendant has the burden of presenting "definite, specific, detailed, and nonconjectural facts" to establish that there are disputed issues of material fact

---

[1] The Executive Committee transferred this case from Judge Der-Yeghiayan's docket to this Court's docket on January 18, 2018 [see 46] in anticipation of Judge Der-Yeghiayan's retirement.

sufficient to warrant an evidentiary hearing. *United States v. Rodriguez*, 69 F.3d 136, 141 (7th Cir. 1995). The defendant must make this *prima facie* showing of illegality without relying on vague or conclusory allegations. See *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992). As set forth below, after considering Defendant's motion to suppress, the Court concludes that Defendant has not met his burden. Therefore, the Court will not disturb Judge Der-Yeghiayan's prior ruling declining to set an evidentiary hearing in this matter.

### B. Facts[2]

The superseding indictment in this case charges Defendant with one count of distributing a substance containing a detectable amount of cocaine in violation of 21 U.S.C. § 841(a)(1). [See 38.] This charge arises from Defendant's arrest by DEA agents on November 21, 2016 in the parking lot of an automobile repair and maintenance shop in Chicago, Illinois.

According to Defendant, on the afternoon of November 21, 2016, he was sitting in the front passenger seat of a car with Individual A, who was sitting in the driver's seat. [30, at 2.] The car was parked in the parking lot of the auto shop where Defendant worked. [*Id.*] At approximately 3 p.m., four law enforcement vehicles drove into the parking lot. Three of the vehicles surrounded the car in which Defendant and Individual A were sitting, and the fourth parked at the single narrow opening to the lot, blocking its only entrance and exit. [32, ¶¶ 2–3; 35, at 2.] Approximately six law enforcement agents exited these vehicles and surrounded Defendant and Individual A. The agents identified themselves as law enforcement officers and carried badges and sidearm handguns. [30, at 2; 32, ¶ 4.] The handguns were visible to Defendant; however, Defendant does not allege that the agents unholstered their weapons at any time during this encounter.

---

[2] These background facts are taken from Defendant's affidavit filed in support of his motion [32], as well as the briefs filed by Defendant and the Government [30; 33; 35; 36].

The law enforcement agents ordered Defendant to step out of the vehicle, and Defendant complied with this order. [30, at 2; 32, ¶ 5.] After Defendant exited the vehicle, he was led by the agents to another area of the parking lot. The agents led him to this area with both verbal directions and by physically touching his clothing, arms, shoulder, and back. [32, ¶ 5; 35, at 3.] Once Defendant was in this other area of the parking lot and separated from Individual A, several agents questioned him about what he was doing with Individual A. [35, at 3.] The agents maintained physical contact with Defendant during questioning. [*Id.*] In response to these questions, Defendant stated that there might be a bag of white powder concealed inside a hidden trap inside the vehicle where he had been sitting. [30, at 3.] Defendant was then arrested and, during the search incident to his arrest, agents recovered three cellular telephones and approximately $4,530 in cash from his person. [*Id.*] According to Defendant, the agents never asked him if he was willing to exit the vehicle or talk to them. He did not want to do those things but believed he was required to do so. [32, ¶¶ 8–13.] Defendant avers that a surveillance video depicting the circumstances of his arrest confirms his own recollections of that day. [35, at 1–3.]

According to the Government, law enforcement agents had Individual A under surveillance on November 21, 2016 because the agents had information that he trafficked controlled substances in kilogram quantities in the Chicago area. [33, at 1.] Surveillance that day began at approximately 10:00 a.m. Agents observed Individual A drive a gray Chrysler sedan several times throughout the day. At approximately 2:27 p.m., agents observed Individual A drive away from his residence in a different car, a black Lexus SUV. [*Id.*, at 1–2.] DEA agents had information that this particular SUV had a hidden trap compartment that was used to transport narcotics. [*Id.*, at 2.]

The agents followed Individual A to the auto shop and observed him sitting in the driver's seat of the SUV, which was parked in the shop's parking lot. [*Id.*] An agent then observed two Hispanic males, Defendant and Individual B, in that parking lot. Agents had information that Individual A's narcotics source was an unidentified Hispanic male. [*Id.*, at 1.] Individual B was observed retrieving a tool bag from another car parked in the lot. Individual B and Defendant were then observed walking towards Individual A's SUV. The agent saw Individual B place the tool bag in the rear passenger side of the SUV, lean into the car for a few seconds, and the close the door and walk away. Defendant then entered the front passenger seat of the SUV. [*Id.*, at 2.]

Law enforcement agents entered the parking lot and events proceeded as described above. According to the Government, agents asked Defendant to step out of the vehicle, and Defendant agreed to do so. [*Id.*] Once agents had escorted Defendant away from the SUV, they questioned him about why he was in Individual A's car, told Defendant what they had observed, and told Defendant they believed that drugs had been placed into the SUV's hidden trap compartment. At this point, Defendant made the allegedly incriminating statement regarding white powder in the SUV's trap compartment. [*Id.*, at 3.]

Other agents simultaneously questioned Individual A. Agents had information that Individual A always carried a firearm, and therefore agents patted him down with his consent. [*Id.*] Individual A also gave agents his consent for them to search the SUV. Agents observed that the tool bag they had previously seen was in the back seat of the vehicle; the floor mats were thrown on the seats of the vehicle; the carpet in the back hatch area was a different color than the rest of the carpet in the vehicle; and non-factory metal appeared under the carpet in the back of the vehicle. [*Id.*] Agents then placed both Individual A and Defendant under arrest and

4

recovered the items described above in the course of arresting Defendant. [*Id.*] Agents also recovered multiple kilograms of cocaine in the trap compartment of the SUV. [*Id.*, at 4.]

Defendant has moved to suppress (1) his statement regarding the presence of cocaine in the SUV's trap compartment and any other allegedly incriminating statements he made at this time; (2) the cell phones recovered from his person; and (3) the $4,530 in cash recovered from his person. Defendant has also moved for an evidentiary hearing on his motion to suppress. Defendant argues that he was subjected to a full custodial arrest, or alternatively a cognizable investigatory seizure, without probable cause or reasonable suspicion. Defendant also argues that because his statements were the product of a custodial interrogation conducted without his being given *Miranda* warnings, they were not voluntary.

On September 19, 2017, Judge Der-Yeghiayan denied Defendant's request for an evidentiary hearing via oral ruling at a status hearing. [See 49.] This oral ruling does not appear to address the merits of Defendant's motion to suppress. After the case was transferred to this Court, Defendant moved for reconsideration of Judge Der-Yeghiayan's prior ruling on the evidentiary hearing issue.

## II. Analysis

### A. The *Terry* Stop of Defendant was Lawful

Defendant first argues that at the time he was questioned by law enforcement agents, he was subject to a cognizable Fourth Amendment seizure. Defendant further submits that this seizure constituted a full-blown arrest without sufficient probable cause. To the extent that this seizure instead constituted an investigatory stop, Defendant argues that it took place without reasonable suspicion. Under either scenario, Defendant insists that any incriminating statements or physical evidence obtained as an unattenuated result of this seizure must be excluded from

evidence at trial. [30, at 5.] The Government responds that DEA agents had reasonable suspicion to conduct an investigatory stop of Defendant and that the stop did not ripen into an arrest requiring probable cause prior to the questioning of Defendant. [33, at 4.]

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV. Under *Terry v. Ohio*, 392 U.S. 1, 30 (1968), however, officers may stop and briefly detain a person for investigative purposes, without violating the Constitution, if they have reasonable suspicion of criminal activity that is supported by specific and articulable facts. See *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015); *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994). The reasonable suspicion standard is less demanding than probable cause. *Ruiz*, 785 F.3d at 1141; see also *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008) ("Reasonable suspicion is more than a hunch but less than probable cause and 'considerably less than preponderance of the evidence.'") (citation omitted). Whether reasonable suspicion of criminal activity exists to initiate a *Terry* stop is measured objectively based on the totality of the circumstances at the time of a defendant's seizure, including the circumstances known to the officers at the time of the stop, the experience of the officers, and the behavior and characteristics of the suspect. *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011). Reasonable suspicion "can arise from behavior that may in other circumstances be considered innocent; in other words, context matters." *Ruiz*, 785 F.3d at 1141 (internal quotation marks omitted). While an investigatory stop requires only reasonable suspicion, probable cause may be required when a stop evolves into a *de facto* arrest, such as when "police restraint is so intrusive that, while not technically an 'arrest,' it may be 'tantamount' to an arrest." *Tilmon*, 19 F.3d at 1224 (citing *Dunaway v. New York*, 442 U.S. 200, 212–16 (1979)).

There is no dispute that Defendant's encounter with law enforcement agents in November 2016 constituted a seizure implicating the Fourth Amendment. [See 30, at 3; 33, at 2]; see also *United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015). In order to determine whether this seizure of Defendant exceeded the bounds of a cognizable *Terry* stop, the Court must ask: "(1) whether the police were aware of specific and articulable facts giving rise to reasonable suspicion; and (2) whether the degree of intrusion was reasonably related to the known facts." *Bullock*, 632 F.3d at 1012.

First, the Court agrees with the Government that, at the time Defendant was seized, agents had reasonable suspicion that Defendant and Individual A were involved in criminal activity. The Government established that agents were aware of several specific and articulable facts that supported this suspicion. See *Ruiz*, 785 F.3d at 1141; *Bullock*, 632 F.3d at 1012. Agents knew that Individual A was a suspected drug trafficker. Agents had observed him driving a gray Chrysler sedan several times earlier in the day on November 21, before switching to a black Lexus SUV. Agents knew that this particular vehicle had a trap compartment used to transport narcotics. Once Individual A had parked his car in the lot at the auto shop, agents observed Defendant and another individual retrieve a tool bag from another car in the lot and place it in the backseat of the SUV, where they understood the trap compartment to be, before Defendant got into the front passenger seat of the SUV.

Based on the totality of the circumstances, agents could reasonably suspect that Defendant and Individual A were conducting a narcotics transaction in the SUV. Law enforcement agents might not have actually seen drugs being exchanged, but that is not necessary to support reasonable suspicion of such a transaction. See *Ruiz*, 785 F.3d at 1143 (noting that reasonable suspicion existed to stop defendant suspected of having engaged in a drug

7

transaction, even though officers had not seen the defendant carrying anything that might have contained drugs); *Bullock*, 632 F.3d at 1012–14 ("Even though [the police officer] did not observe drug-dealing activity * * * [defendant's] suspicious activity * * * corroborated the anonymous caller's tip of drug-dealing activity."); *United States v. Amaya*, 227 F. Supp. 3d 930, 936–37 (N.D. Ill. 2016) (reasonable suspicion existed to detain suspect where officers knew a drug delivery was expected and the suspect was driving the only car in the relevant area). Drug dealers routinely conceal their merchandise in opaque packaging, and the Seventh Circuit has remarked that "a drug dealer who hides his merchandise from public view is not thereby rendered immune from a narcotics-based *Terry* stop." *Ruiz*, 785 F.3d at 1143. Only a reckless dealer would deliver kilograms of powder cocaine in a see-through container in broad daylight. Based on their knowledge of Individual A's drug trafficking activities and Defendant's own actions, in combination with those of Individual A and Individual B, agents could reasonably suspect that Defendant got into the car with Individual A for the purpose of engaging in a drug transaction. Agents therefore could lawfully detain Individual A and Defendant to "verify (or dispel) [their] well-founded suspicions that [Defendant] has been * * * engaged in criminal activity." *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995) (citation omitted).

Defendant argues that agents could not have had reasonable suspicion of his involvement in criminal activity because agents had not observed him committing any overtly criminal conduct, nor had they received any prior information about him or his auto shop that would support such a suspicion. [See 30, at 5; 35, at 7–8.] Specifically, Defendant argues that the only particularized information agents had about him prior to the seizure was wholly consistent with his job as a mechanic. According to Defendant, this information combined with his mere proximity to Individual A was not enough to justify his seizure.

It is true that, in isolation, being seen with a tool bag in the vicinity of an auto shop is not necessarily indicative of anything criminal. But the facts forming the basis of reasonable suspicion are not judged in isolation, but instead are viewed from the totality of circumstances known to the officer at the time of the stop. See *Matz v. Kotka*, 769 F.3d 517, 523 (7th Cir. 2014) (in considering whether law enforcement agents have particularized suspicion to support a *Terry* stop, courts "consider the sum of all of the information known to officers at the time of the stop"). In context, even apparently innocent actions can be suspicious enough to justify a *Terry* stop. See *Ruiz*, 785 F.3d at 1142 (noting that while each of the defendant's actions was capable of innocent explanation, "when all of [Defendant's] actions are viewed in concert and through the lens of experienced law enforcement officers, the innocent explanations begin to look less likely and the not-so-innocent explanations begin to look more likely"); *United States v. Carlisle*, 614 F.3d 750, 755 (7th Cir. 2010) ("The suspicious conduct may be ambiguous and susceptible to an innocent explanation, but the officers may detain the individual to resolve such ambiguity."); *United States v. Chaidez*, 919 F.2d 1193, 1200 (7th Cir. 1990) ("No facts are 'inherently' probative; apparently innocent events may add up to strong suspicion, and apparently damning facts may be innocent. All inferential processes are probabilistic.").

Viewed in the totality of circumstances, at the time law enforcement agents seized Defendant, they could point to specific and articulable facts about his conduct that supported the stop. Defendant and Individual B were not seen merely carrying a tool bag around an auto shop parking lot as employees of such a shop might be expected to do: they were seen taking a tool bag out of one car and placing it into a second car. This second car belonged to Individual A, someone known to the agents as a narcotics trafficker. Defendant then got into the front passenger seat of the car with Individual A. None of these activities—placing a tool bag in a car

in the parking lot and getting into the passenger seat of the car—are the norm for a mechanic dealing with a regular customer seeking service. Taken together, these facts and the reasonable inferences drawn from those facts justified agents stopping Defendant to assess whether he was engaged in criminal activity, specifically a narcotics transaction. This was based not only on Defendant's proximity to Individual A, but the specific circumstances surrounding Individual A's earlier actions as established by the surveillance that agents were conducting and by Defendant's own actions. Agents did not need to have more information specific to Defendant prior to initiating the stop. See *Ruiz*, 785 F.3d at 1138 (*Terry* stop of defendant did not violate the Fourth Amendment where officers began to follow him after seeing him apparently engage in a drug transaction); *Matz*, 769 F.3d at 524 (stop of individual was supported by reasonable suspicion where officers were attempting to apprehend another known individual). Even the eponymous stop upheld in *Terry* itself involved a police officer who "was not acquainted with any of the three men by name or by sight, and [] had received no information concerning them from any other source" and had only observed actions that were suspicious based on the officer's years of experience. *Terry*, 392 U.S. at 7. In sum, the totality of circumstances adequately supports the agents' reasonable suspicion that Defendant himself was engaged in criminal activity and thus support the investigatory stop.[3]

---

[3] Defendant also argues in his reply that the Government omits from its opposition (and has omitted from discovery) any factual basis for why the agents suspected Individual A of being involved in narcotics trafficking and that the agents had no basis for having Individual A under surveillance. [See 35.] Defendant appears to be arguing here that the agents did not actually know Individual A to be a drug trafficker and therefore the Court should disregard this fact in its analysis of whether agents had reasonable suspicion to detain Defendant. However, Defendant does not provide any basis for this argument. And, to the extent Defendant is arguing that law enforcement agents violated Individual A's Fourth Amendment rights in order to place him under surveillance on November 21, 2016, Defendant does not have standing to assert these rights. See *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978) ("Fourth Amendment rights are personal rights which * * * may not be vicariously asserted.") (citation omitted).

Having determined that reasonable suspicion existed to initiate an investigatory stop of Defendant, the next question the Court must ask is whether the degree of intrusion officers used was reasonably related to the known facts. *Bullock*, 632 F.3d at 1012. "A *Terry* stop based on reasonable suspicion can ripen into a de facto arrest that must be based on probable cause if it continues too long or becomes unreasonably intrusive." *Id*. at 1015. There is no "litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop." *Tilmon*, 19 F.3d at 1224 (quoting *Florida v. Royer*, 460 U.S. 491, 506 (1983)). "For an investigative stop based on reasonable suspicion to pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." *Bullock*, 632 F.3d at 1015 (citation omitted).

The Court concludes that the degree of intrusion that law enforcement agents used in stopping and questioning Defendant was reasonably related to the facts known to them at the time, and therefore their conduct did not exceed the bounds of a permissible *Terry* stop. Initially, the Court notes that Defendant makes no argument that the duration of the stop was longer than a few minutes or took longer than necessary to gauge whether a drug transaction had occurred in the SUV. See *Ruiz*, 785 F.3d at 1144–45 (*Terry* stop of defendant lasting over 30 minutes was of a reasonable duration where the encounter lasted no longer than was necessary to effectuate the purpose of the stop).

In terms of the degree of the intrusion, the agents' actions were reasonably related to the facts known to them at the time. Agents suspected that they had witnessed a drug transaction, and therefore they surrounded the individuals involved and prevented them from leaving the

immediate area, physically separated the suspects, and asked Defendant a series of questions to confirm or dispel the suspicion that a drug transaction actually took place.

As Defendant characterizes the encounter, the agents were shouting at him and physically restrained him using their hands in order to steer him in the direction they wanted him to go in the parking lot. The agents also maintained constant guard over him once he was relocated. Accepting Defendant's full version of the facts, the agents' use of this level of force to restrain Defendant was reasonable. Restraining an individual while investigating suspected criminal activity is permissible during a *Terry* stop, even by using handcuffs or other physical restraints if necessary according to what the officers know about the situation. See *Matz*, 769 F.3d at 525 (given the circumstances of the stop, it was reasonable for officers to handcuff individual "while they controlled the situation" and accounted for individuals at the scene); *Bullock*, 632 F.3d at 1016 (it was reasonable to place Defendant in handcuffs and in a squad car while pursuing investigation); *United States v. Shoals*, 478 F.3d 850, 853 (7th Cir. 2007) (officers did not convert a *Terry* stop into an arrest by drawing their weapons, ordering defendant to exit the house where he was located, and handcuffing him). The agents' use of their hands (without deploying handcuffs) to physically control Defendant's movements before they asked him a series of questions was undoubtedly intrusive, but it was no more intrusive than necessary for the agents to prevent Defendant from leaving the area before they could confirm or dispel their suspicions regarding Defendant's activities inside the SUV. See *Amaya*, 227 F. Supp. 3d at 939 ("[I]f there is reasonable suspicion supporting a detention, the officers involved may use reasonable force to effect the detention.") (citing *United States v. Denney*, 771 F.2d 318, 321 (7th Cir. 1985)). Similarly, the agents' use of a vehicle to block the only exit from the auto shop's

parking lot was a reasonable way to ensure the targets of the investigatory detention did not attempt to evade the stop. See *Tilmon*, 19 F.3d at 1226.[4]

Separating Defendant and Individual A by leading them to separate parts of the parking lot also was reasonable. Law enforcement agents suspected that Individual A had a handgun, and thus separating Individual A and Defendant to different areas of the parking lot ensured the safety of the individuals on the scene. See *Bullock*, 632 F.3d at 1016; see also *Tilmon*, 19 F.3d at 1227 (police officers were justified in taking measures to protect themselves when they had information that suspect was armed and dangerous).

Agents then asked Defendant questions regarding his presence in Individual A's car. Such questions were limited in scope and related to the purpose of the stop: to verify whether a drug transaction had in fact taken place. See *Amaya*, 227 F. Supp. 3d at 930. Defendant points out that the agents questioning him during this encounter were armed, and that the officers' weapons were visible to him at all times. But "this by itself is unremarkable for on-duty police officers" (*DeWitt v. United States*, 678 F. App'x 407, 410 (7th Cir. 2017)), and Defendant does not say that the agents ever pointed their weapons at him or at Individual A. As such, agents' display of weapons did not transform the *Terry* stop into a *de facto* arrest. See *Patterson*, 826 F.3d at 457.

Defendant has not raised any factual dispute regarding the existence of reasonable suspicion to justify a *Terry* stop, or regarding the circumstances of that stop, that would warrant an evidentiary hearing on his motion. Defendant argues that he is entitled to an evidentiary hearing based on a list of "numerous" disputed questions of material facts. [See 35, at 4–5.] But the disputes that Defendant points to—such as whether or not he was in custody at the time of his

---

[4] The layout of the scene also establishes that agents arriving en masse would not have had many other options for parking their vehicles in the space presented by the parking lot and the sole driveway into that lot.

interrogation by agents, and whether his seizure was a custodial arrest or investigatory detention—are questions of law rather than questions of fact.

Before being entitled to an evidentiary hearing, Defendant must present "definite, specific, detailed, and nonconjectural facts" to establish that there are disputed issues of material fact sufficient to warrant an evidentiary hearing. *Rodriguez,* 69 F.3d at 141. Defendant disputes the importance of certain facts or the reasonableness of using those facts as a basis for an investigatory stop, but he does not dispute the existence of those facts. For example, he does not dispute the fact that another individual (Individual B) was seen carrying a tool bag, that the tool bag was placed in Individual A's SUV, or that Defendant got into the front passenger seat of the SUV. Defendant only disputes whether these facts can form a basis for a reasonable suspicion of criminal activity on his part. This type of dispute does not warrant an evidentiary hearing. See *id.*; *United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011). Even accepting Defendants' version of the facts in full, no dispute exists that is sufficient to warrant an evidentiary hearing on Defendant's motion.[5]

In sum, Defendant's motion to suppress his statements is denied. Defendant has raised no arguments about the propriety of his arrest based on his answers to the questions from law enforcement agents in combination with other circumstances at the scene, and he does not challenge the search incident to his arrest apart from his challenges to the propriety of the initial questioning that led to his allegedly incriminating statements. Defendant's motion to suppress

---

[5] In Defendant's reply, Defendant disputes the Government's contention that agents inspected the interior of Individual A's vehicle on the scene. [35, at 10.] But the Government does not allege that this inspection formed any basis of the decision to initiate a stop of Defendant, and the Court has not considered it in the analysis of whether reasonable suspicion existed as a basis for Defendant's seizure. Therefore, this factual dispute is not material and does not warrant an evidentiary hearing. See *Curlin*, 638 F.3d at 564 (evidentiary hearing is only warranted when there are disputed issues of material fact "that will affect the outcome of the motion").

the cell phones and cash found on his person during the search incident to his arrest therefore is also denied.

B.     **Defendant's Confession was Voluntary**

Defendant next argues that his incriminating statements were involuntary under *Miranda v. Arizona*, 384 U.S. 436 (1966), and therefore must be excluded from evidence at trial, because he was subjected to a custodial interrogation without being advised of his *Miranda* rights. [30, at 6–7.] The Government responds that the Defendant was not subject to a custodial arrest at the time he was initially questioned, and therefore a reading of his *Miranda* rights was not necessary. [33, at 8–9.]

Prior to subjecting a suspect to custodial interrogation, law enforcement agents must advise him of his constitutional rights to remain silent and to have counsel present. See *Ruiz*, 785 F.3d at 1145 (citing *Miranda*, 384 U.S. at 471–72). Here, Defendant undoubtedly was subject to interrogation when agents questioned him about why he was in Individual A's car. [30, at 3; 33, at 3.] To determine whether *Miranda* warnings were necessary, the Court must determine whether or not Defendant was "in custody" at the time of these questions. A person is "in custody" for *Miranda* purposes "if there was a formal arrest or a restraint on his or her freedom of movement of the degree associated with a formal arrest." *Patterson*, 826 F.3d at 455 (internal quotation marks and citation omitted). To determine whether an interrogation was custodial, the Court must ask whether "given the totality of the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave." *Ruiz*, 785 F.3d at 1145 (quoting *United States v. Littledale*, 652 F.3d 698, 701 (7th Cir. 2011)). This is an objective inquiry, and relevant factors to consider are "(1) the location of the interrogation; (2) the duration of the interrogation; (3) any statements made by the suspect during the interrogation;

15

(4) any use of physical restraints during the interrogation; and (5) whether the suspect was released at the end of the interrogation." *Patterson*, 826 F.3d at 455 (citing *Howes v. Fields*, 565 U.S. 499, 509–10 (2012)). The Seventh Circuit has provided a list of non-exhaustive example factors relevant to this analysis, including "whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed." *Patterson*, 826 F.3d at 455 (citations omitted). A *Terry* stop alone does not necessarily mean that an individual is in custody for *Miranda* purposes. *Id.* at 457.

Consistent with the Court's holding that the *Terry* stop of Defendant never developed into a *de facto* arrest, the Court concludes that Defendant was not in custody at the time he was questioned. The totality of circumstances surrounding Defendant's detention and questioning weighs against a custody determination here. The entire encounter took place in public view during business hours at Defendant's auto shop. See *Ruiz*, 785 F.3d at 1145 (fact that encounter with law enforcement takes place in public weighs against a finding of custody). While agents physically restrained Defendant using their hands in order to direct him to another area of the parking lot, no handcuffs were used to restrain Defendant at any point prior to or during questioning. See *United States v. Thompson*, 496 F.3d 807, 811 (7th Cir. 2007) ("The bare fact of physical restraint does not itself invoke *Miranda*[.]") (citation omitted); see also *Littledale*, 652 F.3d at 702 (fact that suspect was not physically touched or handcuffed weighed against a finding that suspect was in custody). Law enforcement agents were armed during the encounter, but their weapons were never unholstered during Defendant's questioning. See *Patterson*, 826

16

F.3d at 457 ([T]he fact that the agents were armed does not weigh in favor of custody. It is reasonable to assume that all law enforcement personnel who are on duty and actively investigating crime are armed.").

Some factors surrounding Defendant's interrogation do point in the opposite direction—*i.e.*, in favor of a custody determination. Defendant was arrested immediately after he was questioned based in part on his answers to these questions. *Cf. Patterson*, 826 F.3d at 458 (fact that suspect was not immediately arrested after questioning weighs against a custody determination); *Thompson*, 496 F.3d at 811 (same). There is no indication in the current record that Defendant was ever told that he was free to leave, and the location of police vehicles blocking the only exit to the parking lot may have "subtly undermined" any such message in any event. *Ruiz*, 785 F.3d at 1145. According to Defendant, the agents were "loud" and "assertive," which may weigh in favor of custody. See *Patterson*, 826 F.3d at 457; *Littledale*, 652 F.3d at 702 (officers during questioning used a "monotone tone of voice," indicating suspect was not in custody). Defendant was also forced to move from one location to another, although any custodial aspect of that movement is mitigated by the fact that Defendant was never forced to leave the parking lot in which he was initially seized, and he was only moved a short distance away.

On balance, however, these factors do not tip the scale in favor of a custody finding. This encounter did not take place in an environment presenting "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 510. Defendant was subjected to brief questioning at his workplace as part of a lawful *Terry* stop in order to confirm or dispel the agents' reasonable suspicion of criminal activity—specifically, a narcotics transaction. The questioning of Defendant happened quickly as a part of this

investigative stop. Defendant was not formally placed under arrest until after he had answered agents' questions as part of this lawful *Terry* stop. Although Defendant claims that the interrogation was involuntary because he did not want to answer their questions, [35, at 3], the question of whether a Defendant is in custody is objective. See *United States v. Wyatt*, 179 F.3d 532, 536 (7th Cir. 1999) ("[T]he test is not whether the defendant was under a subjective belief that his or her movements were restricted, but whether a reasonable person in the defendant's position would believe that he or she was free to leave.") (quoting *United States v. Lennick*, 917 F.2d 974, 977 (7th Cir. 1990)). In the final analysis, because Defendant was not in custody, no *Miranda* warnings were necessary prior to the questioning. See *Patterson*, 826 F.3d at 457.

Defendant does not raise any factual dispute to warrant an evidentiary hearing on this issue. Although Defendant and the Government characterize the encounter differently—for example, Defendant states he was "ordered" out of the SUV, while the Government claims that Defendant was "asked" to step out of the car—these disputed facts are not outcome-determinative. See *Curlin*, 638 F.3d at 564 (evidentiary hearing is only warranted when there are disputed issues of material fact "that will affect the outcome of the motion"). Even accepting Defendant's characterization of the encounter, the totality of the circumstances indicate that Defendant was not in custody at the time that he was questioned by law enforcement agents and made the allegedly incriminating statements that he seeks to suppress.

## III. Conclusion

For these reasons, the Court denies Defendant's motion for reconsideration of Judge Der-Yeghiayan's ruling declining to set this matter for a suppression hearing and denies Defendant's motion to suppress [30].

Date: May 14, 2018

_____
Robert M. Dow, Jr.
United States District Judge